IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Tanya Cain, | C/A No. 3:18-cv-2120-JFA-SVH |
| Plaintiff, | |
| vs. | **ORDER** |
| Providence Hospital, LLC d/b/a Providence Health, | |
| Defendant. | |

## I.    INTRODUCTION

In this employment discrimination case, Tanya Cain ("Plaintiff") sues her former

employer, Providence Hospital, LLC d/b/a Providence Health ("Defendant"), based on her

termination. Plaintiff alleges claims of (1) race discrimination in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"); (2) retaliation in

violation of Title VII; (3) defamation; and (4) tortious interference with prospective

contractual relations. All pretrial proceedings in this case, including the instant motion for

summary judgment (ECF No. 34) were referred to a Magistrate Judge pursuant to the

provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.).

The Magistrate Judge assigned to this action[1] prepared a thorough Report and

Recommendation ("Report") and opines that this court should grant Defendant's motion

---

[1] The Magistrate Judge's review is made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.). The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a de novo determination of those portions of the Report and

for summary judgment as to Plaintiff's claims of race discrimination, retaliation, and tortious interference with prospective contractual relations and deny the motion as to the remaining defamation claim. (ECF No. 46). The Report sets forth, in detail, the relevant facts and standards of law on this matter, and this Court incorporates those facts and standards without a recitation.

Both parties timely filed objections to the Report (ECF Nos. 49 & 50) along with responses to opposing objections (ECF Nos. 51 & 53). Thus, this matter is ripe for review.

## II.    LEGAL STANDARD

The court is charged with making a *de novo* determination of those portions of the Report to which specific objections are made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). However, a district court is only required to conduct a *de novo* review of the specific portions of the Magistrate Judge's Report to which an objection is made. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); *Carniewski v. W. Virginia Bd. of Prob. & Parole*, 974 F.2d 1330 (4th Cir. 1992). In the absence of specific objections to portions of the Report of the Magistrate, this court is not required to give an explanation for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Thus, the court must only review those portions of the

---

Recommendation to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b).

Report to which Petitioner has made a specific written objection. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 316 (4th Cir. 2005).

"An objection is specific if it 'enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute.'" *Dunlap v. TM Trucking of the Carolinas, LLC*, No. 0:15-cv-04009-JMC, 2017 WL 6345402, at *5 n.6 (D.S.C. Dec. 12, 2017) (citing *One Parcel of Real Prop. Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996)). A specific objection to the Magistrate Judge's Report thus requires more than a reassertion of arguments from the complaint or a mere citation to legal authorities. *See Workman v. Perry*, No. 6:17-cv-00765-RBH, 2017 WL 4791150, at *1 (D.S.C. Oct. 23, 2017). A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

"Generally stated, nonspecific objections have the same effect as would a failure to object." *Staley v. Norton*, No. 9:07-0288-PMD, 2007 WL 821181, at *1 (D.S.C. Mar. 2, 2007) (citing *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)). The court reviews portions "not objected to—including those portions to which only 'general and conclusory' objections have been made—for *clear error*." *Id.* (emphasis added) (citing *Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47).

The legal standard employed in a motion for summary judgment is well-settled and correctly stated within the Report. Accordingly, that standard is incorporated herein without a recitation.

## III.  FACTUAL AND PROCEDURAL HISTORY

As stated above, the relevant facts and standards of law on this matter are incorporated from the Report. However, a brief recitation of the factual background is necessary to analyze the various objections provided by each party.

Plaintiff (white) was hired by Defendant on February 18, 2008, as the Senior Charge Nurse in the endoscopy department. Prior to her termination, Plaintiff reported to Defendant's Director of Surgical Services, Greta Kennedy (black), who started working with Plaintiff in December 2016 and became her supervisor in April 2017[2]. Prior to Kennedy, Plaintiff's supervisor was Holly Lewis (white). Kennedy reported to Stephanie Simmonds (white), Defendant's Chief Nursing Officer. Plaintiff did not receive any formal disciplinary action from Kennedy or any other supervisors prior to her termination.

In May 2017, Plaintiff complained that she was not getting full pay for the call hours she worked. Plaintiff first notified Kennedy and then advised Justin Lofurno in Human Resources, before finally contacting Simmonds. Lofurno eventually identified the issue and advised Plaintiff Defendant would resolve the issue, which affected several other employees.

The endoscopy department provides a variety of different services and procedures for the purpose of diagnosing patient illnesses such as colon cancer and gastric bleeding. As Senior Charge Nurse for endoscopy, Plaintiff was a working supervisor, performing endoscopy screenings in addition to her managerial responsibilities. Throughout Plaintiff's

---

[2] Plaintiff alleges that Kennedy started serving as the interim Director of Surgical Services in or around October-November 2016.

employment, the endoscopy department was accredited by the nationally recognized Joint Commission and/or DNV GL-Healthcare ("DNV"). Achieving accreditation, which occurs only upon passing unannounced reviews by surveyors from the respective accrediting agency to determine whether the hospital is meeting established standards, can impact Medicare and Medicaid reimbursement. To prepare for the accreditation surveys, Defendant conducted periodic preparedness surveys of its various departments, the results of which were then shared with the department leader.

On June 15, 2015, Defendant conducted an internal audit that identified multiple deficiencies in the endoscopy department, including that it "lacks endoscopy-specific policies outlining processes and procedures such as equipment cleaning process and procedural processes." The audit also found the endoscopy department lacked proper procedures for cleaning equipment, including endoscopes, and procedure rooms. Defendant reviewed the audit findings with Plaintiff and instructed her to fix the deficiencies immediately.

On September 9, 2015, DNV conducted its 2015 audit and the auditor reported endoscopy staff, who were supervised by Plaintiff, were not properly transporting endoscopes from patients' rooms to the endoscopy department. Defendant reviewed the identified deficiencies with Plaintiff and instructed her to remedy the issues.

Approximately six months later, Defendant conducted an internal preparedness survey. The survey identified multiple deficiencies in the endoscopy department. Some of these deficiencies, such as issues with the temperature on the blanket warmers and maintaining a proper eyewash station, had been identified in previous audits but not

remedied by Plaintiff. Other deficiencies were new, such as the discovery that the endoscopy staff was flushing used colonoscopes with water at patients' bedsides rather than the required enzyme solutions, which the report indicated violated the Society of Gastroenterology Nurses and Associates' ("SGNA") standards. Plaintiff testified in her deposition that she was unsure if SGNA standards prohibited flushing with water at the bedsides at this time, but she believed she provided the SGNA standards in response to the audit, and Defendant agreed the policy should be to follow manufacturer guidelines, which allowed for washing at bedside with water only. As Chief Nurse for the endoscopy department, Plaintiff was tasked with correcting the items identified in the audit.

Later in 2016, Defendant conducted another internal audit. That audit identified deficiencies in the endoscopy department, some of which had been identified previously but not corrected by Plaintiff, such as improperly storing endoscopes while not in use. Plaintiff failed to correct this deficiency despite being instructed to do so. Based on the repeated and uncorrected issues in the endoscopy department, then-Director of Surgical Services Holly Lewis issued Plaintiff a "Growth Plan" on September 30, 2016. The Growth Plan identified Defendant's expectations for Plaintiff, specifically including preparedness for audits and ensuring compliance with DNV, the Joint Commission, and other applicable standards. Plaintiff acknowledged her understanding of these expectations.

On December 6, 2016, the Joint Commission conducted an audit. It identified several deficiencies in the endoscopy department, including that staff were improperly transporting sanitized endoscopes. Defendant reviewed the findings with Plaintiff, some of which had been identified in 2015 by DNV, and instructed her to correct them immediately.

Robin Yackell (white), Senior Director of Surgical Services for Defendant's corporate parent company, was responsible for overseeing the quality of operations of surgical services (including endoscopy) at LifePoint–affiliated facilities such as Providence. In June 2017, Yackell conducted an audit of Defendant's endoscopy department. Yackell found multiple deficiencies in the endoscopy department, several of which had been previously discussed with Plaintiff, including that employees were not properly sanitizing its equipment. Yackell communicated her concern with what she described as Plaintiff's "willful disregard for processes and procedures." Her report stated the following about Plaintiff's leadership:

> As the leader of the department, [Tanya] is tasked with ensuring safe patient care that meets standards set by applicable state, federal and local agencies, accrediting organizations, and professional organizations and groups. [Tanya] verbalized an understanding of the requirements while at the same time acknowledging gaps. . . . In several instances . . . the gaps could be traced directly to her lack of completion. This calls into question the integrity of the leader who sets and communicates expectations. In a high risk area such as endoscopy, many of the responsibilities for ensuring safe care are performed independently and require honesty and integrity to ensure that safe care. During the interview and high level assessment, the gaps were not due to a lack of knowledge but instead clearly communicated as a choice by [Tanya] not to perform the required tasks.

(ECF No. 39-5). Among other recommendations resulting from her audit, Yackell identified "evaluate leader for appropriate job qualifications and fit." *Id.*

After reviewing Yackell's report, and based upon similar findings in past internal and independent audits and the concerns raised in Plaintiff's Growth Plan, Simmonds made the decision to terminate Plaintiff's employment. Simmonds testified she made the decision without input from Kennedy. However, Plaintiff asserts that Kennedy was consulted prior

to the decision to terminate was made. Plaintiff acknowledges that she was responsible for some of the deficiencies in Yackell's report but believes a lesser form of discipline was warranted.

Simmonds communicated her decision to Plaintiff on July 18, 2017, in a meeting which included Kennedy and Lofurno. Simmonds reviewed Yackell's report with Plaintiff, offered her an opportunity to respond, and expressed concern that she was "putting patients at risk" by failing to follow policies and procedures. (ECF No. 34-2, p. 71).

Plaintiff appealed her termination through Defendant's "Problem Resolution Process" policy. The policy permits an aggrieved employee to appeal a termination decision to a panel of five individuals who were not involved in the events resulting in termination. After hearing testimony from Simmonds, Kennedy, Plaintiff, and endoscopy staff nurse Debbie Eason, the panel recommended the termination decision be upheld. Lofurno summarized the panel's factual findings and recommendations in a memorandum to Scott Campbell, Defendant's CEO, who upheld Plaintiff's termination.

While Defendant searched for a full-time replacement for Plaintiff's position, it filled the position on an interim basis with Monica Parks (black), a contract nurse. The position was then offered to a white nurse. When the first white nurse did not successfully complete the hiring process, Defendant offered the position to another white nurse. Eventually, a black nurse was hired to fill the position.

Following her termination, Kennedy told Plaintiff's subordinates in the endoscopy department Plaintiff had to be terminated because of recommendations from Lifepoint. Kennedy also advised Dr. Vasudeva, Defendant's Medical Director for Endoscopy,

Plaintiff had been terminated. Although Plaintiff alleges Dr. Vasudeva was informed that Plaintiff would be terminated based on Yackell's report or for failure to properly clean her scopes, she did not testify as to who allegedly informed Dr. Vasudeva or how Plaintiff knows this information was allegedly communicated. Plaintiff also testified that a sales representative for medical supplies recommended Plaintiff to Dr. Singh (whose position is not identified in the record), to which Dr. Singh responded that he could not hire Plaintiff because she failed to properly clean her scopes.

A recruiter ("Recruiter") from Cross Country Staffing ("Cross Country") advised Plaintiff that Kennedy had given her a poor reference, rating her as "below standard" on the first question asked. Plaintiff received a text from Recruiter stating, "I talked to this lady today Greta, she was not a good reference never use her again!" (ECF No. 42-28). Plaintiff followed up with Recruiter via email to inquire about the response provided by Kennedy, and the recruiter responded, "Tanya attached is the reference sheet, I only got to the first question and I stop, because she said it was below standard." (ECF No. 42-29). Kennedy testified that she remembers a lady calling for a reference for Plaintiff within a year of Plaintiff's termination and did not remember the questions asked or how she responded. Plaintiff never accepted assignments from Cross Country, but she remains in contact with recruiters from Cross Country.

After outlining the above facts, the Magistrate Judge recommended dismissal of Plaintiff's claims for race discrimination, retaliation, and tortious interference with prospective contractual relations and to allow the remaining defamation claim to proceed.

In response to this recommendation, Defendant asserts one specific objection:

The Magistrate Judge erred in denying Defendant's motion for summary judgment on Plaintiff's defamation claim based on Director of Surgical Services Greta Kennedy's purported description of Plaintiff's performance as "below standards" in response to a question from a third party recruiter employed by Cross Country Staffing.

(ECF No. 49, p. 2).

Additionally, Plaintiff advances a number of objections to the report including:

1. The Magistrate erred in finding that Plaintiff failed to show that she was performing her job in a satisfactory manner;
2. The Magistrate erred in finding that Plaintiff has not established an inference of race discrimination;
3. The Magistrate erred in finding that Plaintiff has not established pretext;
4. The Magistrate erred in finding that Plaintiff did not engage in protected activity;
5. The Magistrate erred by limiting Plaintiff's defamation claim based on *Tyler v. Macks* and the Federal Rules of Evidence regarding hearsay; and
6. The Magistrate erred by overlooking the impact of the poor job reference on Plaintiff's prospective contractual relations.

(ECF No. 50, p. 2).

## IV.    DISCUSSION

Initially, it should be noted that together Plaintiff's "objections" appear to be a near verbatim rehashing of those arguments presented in her memorandum in opposition to Defendant's motion for summary judgment. Thus, these objections appear to be generally stated, nonspecific objections which fail to elucidate specific errors in any one portion of the Report. However, the Court will attempt to resolve each objection in turn.

Plaintiff's First Objection

Plaintiff's first objection takes issue with the Magistrate Judge's conclusion that Plaintiff failed to show she was performing her job at Defendant's hospital in a satisfactory

manner. Because Plaintiff lacks direct evidence of discrimination, showing that she was performing her duties in a satisfactory manner is a vital element to her race discrimination claim. *See Jones v. Constellation Energy Projects & Servs. Grp., Inc*., 629 F. App'x 466, 468 (4th Cir. 2015).

The Magistrate Judge based this conclusion on many facts including the findings of six audits of the endoscopy department that Plaintiff directly oversaw. Plaintiff alleges that her past performance assessments and lack of formal disciplinary action create a genuine issue of material fact as to whether Plaintiff was performing in a satisfactory manner that met Defendant's expectations. However, these contentions fail to obviate the multitude of past audits laden with numerous deficiencies, several of which were reoccurring.

In an attempt to circumvent the Magistrate Judge's recommendation, Plaintiff argues that the Growth Plan was not really a past disciplinary action[3] and the audits revealed different deficiencies each time. Regardless of whether the Growth Plan should be considered a past disciplinary action or not, the record clearly indicates a pattern of audits revealing that the department that Plaintiff oversaw continually suffered from deficiencies. Some of which were repeated from audit to audit. Accordingly, Plaintiff's contention that her continued failure to meet expectations was merely a pretext for racial discrimination fails. Additionally, Plaintiff's contention that "it was not uncommon in any department to find deficiencies during audits, as that is the purpose of audits" does little to

---

[3] The Magistrate Judge appears to agree with Plaintiff's description as the Report states that "[a]lthough she had not received formal discipline, she was provided a Growth Plan in September 2016." (ECF No. 46, p. 12).

aid her arguments. Plaintiff was charged with overseeing the endoscopy department to ensure compliance with unannounced audits. The fact that these audits repeatedly found deficiencies speaks only to her continued failure to meet expectations.

Moreover, the Magistrate Judge found that Plaintiff admitted responsibility for at least a portion of the deficiencies listed above and agreed that some form of discipline was warranted. Although Plaintiff now alleges that her testimony was taken out of context, the record clearly indicates that Plaintiff admitted she was responsible for deficiencies and discipline was warranted. Specifically, Plaintiff responded as follows in her deposition:

> Q. So back to my initial question. Do you take responsibility for any of the noted issues that we talked about in endoscopy today?
>
> Plaintiff: I think I'm responsible for some of it, but if I would have had better leadership, then we would have worked out a little bit better, to hold more involvement from my directors or, per se, Robyn, maybe, when she took over things that she included in the this document.
>
> ***
>
> Q. Do you think that some disciplinary action was warranted?
>
> Plaintiff: If it was disciplinary, it should have been in a disciplinary form.
>
> Q. In response to Robyn's audit, do you think some level of discipline was warranted concerning you with respect to Robyn's audit?
>
> Plaintiff: Sure.

(ECF No. 34-2, p. 73–74).

Accordingly, there is no genuine issue of material fact that Plaintiff failed to meet the legitimate expectations of her employer or that she was not performing her job in a satisfactory manner.

<u>Plaintiff's Second Objection</u>

Plaintiff next asserts that the Magistrate Judge erred in finding that Plaintiff failed to establish an inference of race discrimination. Although the finding above that Plaintiff failed to perform in a satisfactory manner obviates the need to adjudicate this particular issue, the Court will address this objection nonetheless.

Initially, Plaintiff argues that Kennedy's involvement in the decision to terminate gives rise to an inference of race discrimination. As the Magistrate Judge stated in the Report however, Plaintiff's belief that Kennedy was responsible for the termination decision was speculation and Plaintiff also failed to provide any authority for the idea that input on a termination decision from a supervisor of another race constitutes circumstance giving rise to an inference of discrimination. In response, Plaintiff again fails to offer any authority in support of her contention. Instead, she only cites back to the record to show that "Kennedy was involved in all discussions with Simmonds regarding the audit findings and Plaintiff's termination . . . and did not disagree or express any concerns regarding Plaintiff's termination." (ECF No. 50, p. 20). Curiously, Plaintiff also "concedes that the mere involvement of a member outside of Plaintiff's protected class in Plaintiff's termination does not give rise to a discrimination claim." (ECF No. 50, p. 19). Accordingly, Kennedy's mere involvement in the termination process does not give rise to an inference of discrimination.

Plaintiff next argues that she can show circumstances giving rise to an inference of discrimination because she was replaced by a black female. In making this argument, Plaintiff objects to the Magistrate Judge's finding that this position was offered to two

white candidates before a black nurse was hired. However, Plaintiff offers no support for the contention that an eventual replacement by a member outside of the protected class gives rise to an inference of discrimination. Accordingly, the Court finds no error with the Magistrate Judge's conclusion that the ultimate hiring of a black nurse cannot offer an inference of discrimination when the job was first offered to not one, but two white candidates.

The last argument made in support of Plaintiff's inference of discrimination objection is that she has offered evidence of valid comparators to show she was treated differently than similarly situated employees outside her race. In support of this argument, Plaintiff attempts to show that the leader in the bronchoscopy department, Kennedy herself, and a black nurse who received a one-day suspension were similarly situated but treated differently. However, as explained by the Magistrate Judge, none of these individuals are proper comparators.

The bronchoscopy department leader was a black nurse who was not terminated despite Yackell's report on the bronchoscopy department noting similar deficiencies. However, this nurse did not have a history of continued deficiencies in internal and external audits and her report noted far fewer deficiency findings as compared to Plaintiff's deficiency findings. As to Kennedy, Plaintiff fails to indicate that Kennedy was similarly tasked with the specific deficiencies found in the numerous audits. Additionally, Kennedy had only been in her position since April 2017 at the time of Yackell's June 2017 report. Plaintiff also fails to indicate that the black nurse who received a one-day suspension for failing to wear proper protective equipment when cleaning a scope did not have a history

of continued deficiencies or was in any type of managerial position. Accordingly, none of these proposed comparators provide a proper exemplar which would indicate Plaintiff was situated similarly, yet treated differently.

It is true, as Plaintiff states, that comparators need not be identical but rather similar in all relevant respects. *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). However, Plaintiff's objections fail to acknowledge that the Magistrate Judge concluded that the most important factor relevant to Plaintiff's termination was a history of numerous and repeated deficiencies. None of the proposed comparators are similar in this respect. Despite Plaintiff's conclusory assertion that "Plaintiff does not need to show a record of a history of continued deficiencies to establish a valid comparator, because Plaintiff does not have a record of continued deficiencies," the record clearly shows a string of audits which each revealed numerous deficiencies. Accordingly, Plaintiff's objection fails on this argument as well.

Because Plaintiff has failed to make a prima facie showing of discrimination, summary judgment is warranted on this claim. Accordingly, any further analysis as to Plaintiff's objections related to this claim are unnecessary. However, this Court has reviewed Plaintiff's remaining objection on this claim – that the Magistrate Judge erred in finding that Plaintiff has not established pretext – and found the Report correctly addressed this point as well.

<u>Plaintiff's Third Objection</u>

The Magistrate Judge determined that Plaintiff has failed to offer any evidence indicating that the reason for her termination was a pretext for discrimination. In support

of this conclusion, the Report cites to Plaintiff's allegations of disparate discipline and the falsity of Defendant's reason for termination – poor performance. However, as discussed above, Plaintiff has failed to identify a valid comparator because, *inter alia*, none of Plaintiff's alleged comparators had a history of documented deficiencies identified in several audits.

Additionally, the record is rife with evidence of Plaintiff's less than stellar performance and Plaintiff herself admits that some form of discipline was warranted as she was responsible for some of the deficiencies in Yackell's report. The fact that Plaintiff believes the level of discipline should have been less than termination is not evidence of a pretext. The Court does not "sit as a super-personnel department, weighing the prudence of employment decisions made by the defendants." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (holding that pretext is not a vehicle for substituting the court's judgment for that of the employer). The court need not decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. Pepsico*, 203 F.3d 274, 279 (4th Cir. 2000) (citing *DeJarnette*, 133 F.3d at 299). Because Plaintiff has failed to provide evidence that Defendant's reason for her termination was pretext for discrimination, Defendant's motion for summary judgment must be granted.

<u>Plaintiff's Fourth Objection</u>

Regarding Plaintiff's claim of retaliation, the Report indicates that Plaintiff failed to prove she engaged in any protected activity which is an element essential to her claim. *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998)("To

establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action.").

Here, Plaintiff argues that she engaged in a protected activity because (1) she complained that she was being paid differently than Kennedy and (2) she complained about Kennedy to Yackell. However, the Magistrate Judge concluded that Plaintiff complained only about the way she was paid in general, not the way she was paid as compared to Kennedy. Moreover, Kennedy referred this issue to HR personnel who eventually identified the issue, which affected multiple employees, and took steps to resolve it. As to Plaintiff's allegations that she complained about Kennedy to Yackell, the Magistrate Judge correctly concluded that these complaints do not constitute protected activity because Plaintiff never told anyone she believed she was being treated differently because of her race. No evidence in the record shows that Defendant should have understood that Plaintiff's complaints about her supervisor constitute opposition to discrimination just because her supervisor was of another race.

Plaintiff's so-called objection on this point appears to be merely a disagreement with the Magistrate Judge's conclusion supported by the conclusory assertion that "Plaintiff's complaints about the treatment she received from her black supervisor and her supervisor's interference with Plaintiff's ability to supervise other black employees should reasonably have been understood by Defendant as Plaintiff opposing discriminatory conduct, thus constituting a protected activity." (ECF No. 50, p. 27). However, Plaintiff offers no support

to show her complaints were ever made in relation to racial discrimination. Accordingly, Plaintiff has failed to point to any error in the Report and the claim for discrimination must be dismissed as well.

Plaintiff's Fifth Objection

Plaintiff next objects to the Magistrate Judge's conclusion that Plaintiff's defamation claims should be limited based on *Tyler v. Macks* and the Federal Rules of Evidence regarding hearsay. In support of this contention, Plaintiff argues that she "was defamed by her employer when her employer terminated her following the audit and informed employees and others that Plaintiff was terminated based on the audit and/or for failing to properly clean scopes." (ECF No. 50, p. 29). Plaintiff alleges that Kennedy gave "the false insinuation that Plaintiff failed to perform her job duties" which "impugns Plaintiff's professional reputation." *Id.* However, truth is an absolute defense to a claim of defamation. *King v. Charleston County School Dist.*, 664 F. Supp. 2d 571, 587 (D.S.C. 2009). As stated above, Plaintiff was terminated for the multiple deficiencies found in a series of audits of the department that Plaintiff oversaw. Accordingly, any insinuation that Plaintiff was terminated for failing to perform her job duties was a truthful insinuation and therefore not actionable. Additionally, Plaintiff has not shown Kennedy made any statements to endoscopy department staff or to the doctors about her performance or failure to properly clean scopes. [4]

---

[4] Plaintiff admits in her deposition that the allegations of statements made by Kennedy to endoscopy department staff are mere speculation and thus they cannot be used to support her claims. (ECF No. 42-14, p. 13). *See Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). ("unsupported speculation is not sufficient to defeat a summary judgment motion.").

In response to the Magistrate Judge's determination that Plaintiff's arguments fail to support a claim for defamation, Plaintiff's "objection" puts forth the exact same argument verbatim originally presented to, quoted, analyzed, and rejected by the Magistrate Judge. (*Compare* ECF No. 50, p. 29–30 *with* ECF No. 42, p. 28) (both stating that Plaintiff's claim "is based on the Defendant's act of terminating Plaintiff for false and pretextual reason, along with: the statements made by Kennedy to the employees in the endoscopy department regarding Plaintiff's performance and failure to properly clean scopes, the statements made to and by Dr. Vasudeva regarding Plaintiff's failure to properly clean scopes, and the employment reference provided to a Cross Country Trav Corps recruiter by Kennedy."). This mere rehashing of Plaintiff's previous argument is not a proper objection and Plaintiff fails to point to a specific error in the Report. Accordingly, the Report correctly concludes that Plaintiff's defamation claims based on the above assertions should be dismissed.

Moreover, any assertion that Plaintiff's termination itself implies she was unfit for her profession and therefore constitutes per se defamation likewise fails. As the Magistrate Judge stated, this case is distinguishable from *Tyler v. Macks Stores*, 272 S.E.2d 633 (S.C. 1980), in which the plaintiff was terminated shortly after he took a polygraph for wrongful activity, because Plaintiff here was terminated specifically after identifiable deficiencies in a proceeding audit. These are the very same deficiencies to which Plaintiff admitted she was responsible for and for which she should have been disciplined.

As to Plaintiff's hearsay objection, The Magistrate Judge held that the record only shows Kennedy told staff Plaintiff was fired based on the audit findings and told Dr.

Vasudeva Plaintiff was terminated. Therefore, Plaintiff's only remaining evidence of alleged defamation is Kennedy's conversation with the Recruiter from Cross Country. The Report also notes that "[a]lthough Plaintiff testified that a sales representative told her that Dr. Singh told him Plaintiff was improperly cleaning the scopes, Dr. Singh is not an employee of Defendant and the statement is impermissible hearsay. Plaintiff is offering the statement to show that Dr. Singh truly made the statement to the sales representative, and is therefore offering it for the truth of the matter asserted." (ECF No. 46, p. 20). The Magistrate Judge then declined to address whether the email and accompanying text message from the Recruiter constitute sufficient, admissible evidence to establish Plaintiff's defamation claim.

Plaintiff objects to the conclusion that the statements between Dr. Singh and the salesman, the conversation between the salesman and Plaintiff, and any other statements that would be used to establish that publication, would be impermissible hearsay, because such statements hold independent legal significance. It is true that defamatory statements can be words of "independent legal significance" and thus not subject to the prohibition on hearsay. *Jude v. Health Mgmt. Assocs. of W. Virginia, Inc.*, 187 F.3d 629 (4th Cir. 1999).

However, Plaintiff's argument fails to account for the fact that all of the statements she relies on are hearsay within hearsay (also known as double hearsay). Plaintiff is attempting to introduce evidence of Kennedy's out of court statements through the out of court statements of various third parties such as Dr. Singh, the salesman, and Recruiter. To be admissible, both statements must constitute a hearsay exception or exclusion. F.R.E. 805. Any defamatory statements made by Kennedy may hold independent legal

significance or alternatively qualify as statements by a party opponent. However, Plaintiff has offered no explanation for the admissibility of any subsequent statements which would relay Kennedy's initial words made by various third parties. Additionally, this Court disagrees that these statements are not offered for the truth of the matter asserted because Plaintiff is attempting to introduce them for the truth that Kennedy in fact published these statements to a third party, not necessarily for the veracity of the original alleged defamatory statements themselves. Numerous other courts have granted motions for summary judgment based on a plaintiff's attempt to use hearsay in support of a defamation claim. *See Moody v. McLellan*, 367 S.E.2d 449, 453 (S.C. Ct. App. 1988) (granting summary judgment because "Moody failed to come forward with competent evidence that McLellan actually made the alleged statements."); *Sumter v. Jenny Craig, Inc.*, No. 3:14-CV-4460-CMC-SVH, 2016 WL 3397588, at *3 (D.S.C. June 21, 2016) (dismissing the plaintiff's defamation claims because, among other reasons, she had no "personal knowledge or awareness" of the alleged defamatory statement and she failed to produce "an affidavit or testimony from anyone who allegedly originated this information."); *June Cho v. Duke Univ.*, No. 1:18CV288, 2020 WL 353617, at *8 (M.D.N.C. Jan. 21, 2020) ("Dr. Im's declaration that the staff told her the doors were locked because of concerns about Plaintiff's husband is therefore inadmissible double hearsay. Here, the first level of hearsay is what Defendant Hockenberry allegedly told staff. This statement might be admissible under the party-opponent exception to the hearsay prohibition. However, Defendant Hockenberry and Dr. Im deny the statement. Plaintiff has not identified a staff member who can testify to the statement; therefore, the second level of hearsay is what the

staff said to Dr. Im. There is no applicable hearsay exception for the staff's statement."); *Bronitsky v. Bladen Healthcare, LLC*, No. 7:12-CV-147-BO, 2013 WL 5327447, at *2 (E.D.N.C. Sept. 20, 2013) ("Plaintiff only cites his own testimony that Dr. Block told him that Highsmith told Dr. Block certain things about plaintiff. This is plainly inadmissible hearsay.").

Accordingly, these third-party statements as currently offered by Plaintiff are not admissible evidence. *Greensboro Prof. Fire Fighters Ass'n v. Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) (inadmissible hearsay "is neither admissible at trial nor supportive of an opposition to a motion for summary judgment").

In light of the foregoing, this Court declines to adopt the Magistrate Judge's recommendation that summary judgment be denied as to Plaintiff's defamation claim based on Kennedy's conversation with Recruiter. In reaching this conclusion, the Magistrate Judge cites to an email in which Recruiter stated she only asked the first question, but stopped because Kennedy responded "below standard." Although the email does not reference Kennedy by name, the text message sent on the same day that initially alerted Plaintiff that Kennedy was not a good reference and Kennedy testified she was called by a lady who asked her to rate Plaintiff. This is sufficient for a jury to find the email referred to Kennedy. However, the Magistrate Judge did not consider Plaintiff's statements about what the Recruiter told her, as these statements constitute inadmissible hearsay and this Court declines to do so as well. Additionally, this Court goes farther and holds that the email sent by the Recruiter is also inadmissible hearsay for the reasons discussed above. Namely, that it is an unauthenticated statement which constitutes double hearsay.

Accordingly, Plaintiff has failed to offer any admissible evidence to support a defamation claim based on Kennedy's response of "below standard". Based on these grounds alone, Plaintiff's claims for defamation must fail.

Moreover, as discussed above, Plaintiff was properly terminated because her performance was indeed below the standards employed by Defendant and verified by numerous audits. Accordingly, Kennedy's choosing of the preset "below standard" response when given the options of "exceptional," "above standard," "standard," and "almost standard," appears to be a true assessment of Plaintiff. Because true statements cannot constitute defamation, Plaintiff's claims based on this statement must be dismissed. Indeed, this is the same objection asserted by Defendant. Accordingly, no further analysis as to Defendant's objections are necessary.

Plaintiff attempts to combat this conclusion by stating that the "below standard" answer was given in response to the prompt "Demonstrates competency in caring for patients" and Plaintiff never acted below competency in regard to caring for patients. However, Plaintiff acknowledged that Defendant expressed concerns that she was "putting patients at risk" when discussing termination. (ECF No. 34-2, p. 71). Accordingly, this objection too is without merit.

Plaintiff's Sixth Objection

Plaintiff's last objection takes issue with the Magistrate Judge's determination that Plaintiff has not shown Defendant's actions prevented her from forming any contract with Cross Country. A plaintiff may establish tortious interference with a prospective contractual relationship by proving: (1) the defendant intentionally interfered with the

plaintiff's potential contractual relations; (2) for an improper purpose; (3) causing injury to the plaintiff. *Crandall v. Navistar International Transportation Corp.*, 395 S.E.2d 179, 180 (S.C. 1990).

The Report states that Plaintiff's own testimony undermined her tortious interference with a prospective contractual relationship claim as it revealed that (1) she was unable to accept assignments from Cross Country because she had accepted conflicting assignments from another staffing agency, with which she was simultaneously working; (2) Cross Country's failure to contact her was "especially" affected after it received a subpoena, as opposed to receiving a poor reference; and (3) she is still working with Cross Country in the same capacity as she had been before they asked Kennedy for a reference. (ECF No. 46, p. 22).

Within her objection, Plaintiff states that "[f]ollowing Plaintiff's termination, Kennedy was contacted via telephone by a potential employer seeking a reference for Plaintiff. Kennedy gave Plaintiff a poor reference to a prospective employer, Cross Country Staffing, and stated that Plaintiff's performance had been 'below standard'." (ECF No. 50, p. 32). Plaintiff claims that she has reached out to recruiters from Cross Country in search of employment since the poor reference, and she has not been offered any positions by Cross Country since she was told about the reference from Kennedy. However, Plaintiff fails to mention that she had not received any positions prior to the reference either. Accordingly, any argument that the poor reference alone caused any damages to Plaintiff is pure speculation because Plaintiff has failed to show any detrimental change in the contractual relationship or causal relationship to a concrete injury.

Moreover, as stated above, Kennedy's response of "below standard" was given in response to a prompt by a Cross Country recruiter and was true. Accordingly, Plaintiff has failed to present evidence that this statement was given for any improper purpose. For these reasons, the Magistrate Judge correctly concluded that the Defendant's motion for summary judgment should be granted as to Plaintiff's tortious interference with contractual relations claim.

Additionally, it appears that the entirety of Plaintiff's tortious interference claim rests solely on the "below standard" reference given by Kennedy. As discussed above, the only evidence supporting this claim is inadmissible hearsay. Accordingly, Plaintiff has also failed to provide admissible evidence supporting her claim and it fails for this reason as well.

## V.    CONCLUSION

After carefully reviewing the applicable laws, the record in this case, the Report and Recommendation, and the objections thereto, this Court finds the Magistrate Judge's recommendation fairly and accurately summarizes the facts and applies the correct principles of law. Accordingly, the court adopts the Report and Recommendation in all regards except for the recommendation that Plaintiff's claim for defamation based upon the Recruiter's email be allowed to proceed. Therefore, the Report is modified as to this recommendation as discussed above. Thus, Defendant's motion for summary judgment

(ECF No. 34) is granted as to all of Plaintiff's causes of action. Accordingly, all of Plaintiff's claims are dismissed with prejudice.

IT IS SO ORDERED.

*Joseph F. Anderson Jr.*

March 10, 2020
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge